Good morning, your honors. Amy Field on behalf of Appellant City of Los Angeles. Your honors, the law is absolutely clear. No one, rich or poor, has the right to turn, the constitutionally protected right, to turn the public sidewalk into their own personal storage facility. So when my closets become full, when my garage becomes full of stuff, I certainly don't have the right to box up my and put it in front of my local Gelson's or Starbucks or in front of my neighbor's home. Is that what happened in this case, Ms. Field? Is that what happened? Is that, are those the facts we're dealing with? Your honor, the facts we're dealing with are whether there's a constitutionally protected... What are the facts? What are the facts of this case? The facts of this case are people are leaving their personal belongings on the public sidewalks. And City of Los Angeles has been enjoined from removing those items. So people are storing their belongings on the public sidewalk. So that's, you mean the people who didn't store them on the public sidewalk before are now doing it? I think that's correct, your honor. Yes, yes. People are rushing out to put their material in front of Gelson's? Well, your honor, the injunction is limited to a fragile and vulnerable population. No, the injunction doesn't permit people to do it at Gelson's. At Gelson's, people are subject to the same rules of law as everyone else. It's a public sidewalk and you don't have the right to store your stuff there. Tell me, are you saying, you're not saying that they don't, just because it's junk. Like, I mean, what's one person's, you're not saying they don't have a property interest, but you're saying that because you post signs and because it's in a public place that you have a right, and the signs say you're going to destroy it if they leave it, right? Correct. So, you know, are you also saying they don't have a property interest in their stuff? I'm saying once they illegally place it on the public sidewalk, no, they do not have. So, if I illegally park my car in a place where it says, do not park, and the city impounds it and keeps it, is that constitutional? Keeps it permanently or destroys it? Well, I think what you're getting at, your honor, is whether how much process you do when the city impounds your car for illegally parking. Yeah, you're right, we're talking about due process. And again, what you do is you look to the existing rules of law to define whether there is a protected property interest. I don't think you look to law, just to answer the question, if the court law illegally parks your car in a place that says no parking, can you take her car and destroy it? You can definitely impound her car. And destroy it. You can definitely charge her for the impound fees. I didn't ask whether you could charge for impound fees. My question is, can you take it and destroy it? I think you have to look to the existing laws. I don't think you can drive around. You don't know the answer, whether it's yes or no? At a certain point, if it's unlicensed, unregistered, and you can't trace it to the owner, then yes, it can be destroyed. Well, okay, but also too, I mean, it's tricky in the sense that... You're still not answering the question. It's my car, and I park it illegally, and in a tow-way zone, can you take it and destroy it? And my answer... And my car has my registration in it? No. Okay, why isn't that the same thing that's going on here, when the city's taking homeless people's papers that identify them, or other belongings, and destroying them? Why isn't that the same situation? It's not the same thing, because a properly licensed and registered vehicle is not the same thing as a pile of belongings. And I'm not calling it junk. I'm accepting that it's very valuable to you. Streets are made for parking your car on. It can be taken away... It can be towed when it... You would see that, you know, when you're parked illegally or something, and you're given due process, right? You're given a... Even then, when you're taking it to tow it away, and there's a process that's given to the car owner, so that they can get the car back, right? Yes, there is, but that If you license your car, you have a right to use the public streets. That creates a protected property interest that cannot be denied without due process of law. In the case of somebody's personal belongings that are left on the public street, there is no existing rule of law that defines that as a constitutional... What about the Constitution that says the government cannot seize your property without due process of law? Well, I think, Your Honor, that the cases are clear, and I think the best case I have for this is the Amiskita case that says, once again, you look at two existing rules of law, and the existing rule of law here is that it is illegal. You don't have the right to leave your belongings on the public street. Therefore, absent a protected property interest, process is not due. I think you're confusing the definition of property versus whether it's legal or illegal to put it in a particular location. I don't think I am, Your Honor. I think if you go back to the Seminole case, or the Roth case, the Seminole due process case, where I may have the case name wrong, where it has to do with a non-tenured professor at the university whose contract is not renewed at the end of the school year, and whether he has a protected property right, I think the United States Supreme Court was very clear. While he may have a subjective interest in maintaining his contract and being re-employed for the following school year, and may feel that he should be entitled to a statement of reasons as to why his contract is not going to be renewed, the court very specifically said you look to the existing rules and laws, and in that case, he was an outlaw employee. The university didn't have to offer him any reasons. They didn't have to afford him any process. He could just have his contract canceled, and it's the same thing here. You don't have, I mean, really, you think about it. If my closet's become full, and I put my stuff on the public sidewalk, is it really objectively reasonable for me to believe that before the city can remove my stuff that's illegally been placed on the public sidewalk, they have to afford me due process? There's absolutely no law that supports that. Well, cut it out. What about the signs? What do the signs say? The signs give additional warning that you're not allowed to, the signs alert people as to the state of the law, LAMC 5611, that you're not allowed to leave your belongings unattended on the public sidewalk. But what does it say? Does it say they're going to destroy them, or what does it say? I don't believe it says they're going to be, I believe it says it's going to be removed. I thought that maybe the sign said it would be removed and destroyed. I could be wrong on that. Well, that might be significant. Do you have an exhibit that you can point to that has the same signs? Yeah, could you point us to that? Maybe when you sit down, you can find it, what the signs say. Well, I think the reason why I stayed away from the signs, the signs may say it will be removed. Well, you raised the signs. We didn't say anything about the signs. I didn't raise it on appeal, Your Honor. Well, you raised it in this argument. Well, I asked her a question. Yeah. You guys said, what did they say? But she told us about the signs. Well, in any event, Your Honor, I'm not certain if the signs say the property will be destroyed. I kind of purposely stayed away from that because there were lots of factual disputes regarding what happened in these particular instances. And I understand the deferential standard of review given to the lower courts, factual findings. They were against us in this process. And I think this case really has to come back to the more fundamental issue of whether you have a constitutionally protected right to turn the public sidewalks into a storage facility. Because that's essentially what's happening here. Post-injunction, anyone, it's not limited to the homeless. It is limited to skid row. But anyone can See, I guess what I don't understand. If you're conceding they have a property right, I'm not conceding that they have a constitutionally protected property right. In fact, that's my point, that they don't. That once you illegally place your belongings on the public sidewalk and leave it unattended, you don't have a protected property right that triggers due process protections. That's exactly my point. Well, is it that you don't have an expectation of, I mean, it's not that it's not your property. You don't have a constitutionally protected, objectively reasonable expectation that your property will remain undisturbed or that the city Okay, but I guess that's different than whether it's your property. So you kind of first, you're not saying that their junk is not their property. No, I'm not saying that, Your Honor. I understand the value that What you're saying is that if you leave your property on the sidewalk in Skid Row, you have no interest, not only in having the police not take it, but not having any interest in the police not destroying it. That's what I'm saying, Your Honor. It's illegal. It's illegal to do that. And I think if you take this out of Skid Row, put it in Pasadena, I mean, if we have a hoarder in this beautiful neighborhood and their garage is full, they don't have anywhere else to keep the stuff that's so important to them. They value it. Can they really put it on the public sidewalk and the city is unable to remove it? Can they mark it? This is mine. I love this stuff. Please don't take it. I don't think the city of Pasadena would take the property that's on the sidewalk and destroy it. Is the city of Pasadena required to store it at government expense? No, the city of Pasadena would do is tell the homeowner to take it inside. They'd warn the homeowner or they'd give them some kind of process that you can't have your belongings obstructing the sidewalk. They would go knock on the door. How do you know who the owner is in this case, Your Honor? Because they have a house. They have a home, unlike the homeless in Skid Row. They have their own home. What if they put it in front of the local Trader Joe's? What if that's where they decide to put it? We don't know who the owner is. I asked the mayor of Pasadena. I don't think he would go around destroying the citizen's property, and I'm surprised that the city of Los Angeles is doing that. There's no written policy. Is there to say you destroy property? Is this being done pursuant to a written policy to destroy property? Again, we're kind of moving into the factual disputes. Our position is that we're not even removing the unattended property of the homeless. So your answer to my question in this field is that there is not a written policy authorizing this? There is not a written policy to destroy the unattended property of the homeless. Who makes this? If it's not written, is there a moral policy? I don't think there's a policy. I don't think there's a policy at all. Well, who decides to destroy this property? The police department? The city council? The mayor? Our position is, and, again, we're moving into factual disputes, but our position is the Bureau of Street Services, like they do all over the city, they go through the city. If there's a pile of stuff on the sidewalk that looks like it's abandoned, that it doesn't belong to anybody, it's old clothing, it's broken down computers, it's old microwaves, and it's left on the city sidewalk, it doesn't look like it belongs to anyone, it's loaded into a skip loader and taken to the dump. The facts in front of us are that it's members of the police department. I'm sorry? The facts in front of us are that it's police officers who are taking the property and destroying it. No, the police department was there as security, but no, this was done by the Bureau of Street Maintenance. This is cleaning up trash. Now, the plaintiffs dispute that. I mean, I don't know if they dispute who the city workers are. I think everybody agrees it's the Bureau of Street Services, but no. The program has to go through. Okay, well, we diverted the discussion a little bit from your point, so we'll give you an extra minute or two. Do you want it now or do you want it rebuttal? I'll save it for rebuttal. Okay, so you'll have three minutes for rebuttal. May it please the Court, Carol Sobel on behalf of the appellees in this case. To respond to Judge Callahan's question, the sign is submitted in the appellant's excerpt of record at 36A. And what does it say? It says that the property may be subject to disposal. It does not say it will be destroyed. And the court below found that the signs were not adequate notice in this case for a whole series of reasons. First, not all the signs said that the street cleaning or the sidewalk cleaning would occur on the same day as in fact for the plaintiffs involved in the incident outside what's commonly referred to as the hippie kitchen, the soup kitchen on Skid Row. The sign posted there said Monday, Wednesday, and Friday. The hippie kitchen is only open Tuesday and Thursday. So we know that the police, the city has not disagreed that their property was taken on a Thursday. So it did not comport with the sign. In addition, many of the signs are, as the judge recognized below, including the one at the hippie kitchen, the signs are above a second story level. So no one would look at that. No pedestrian walking down the street pushing their shopping cart would look at that. But we're not talking about property dumped on the street. We're talking about every single one of these individuals having their property neatly packed up, tied with bungee cords, covered with blankets, or in the EDAR, the little tents they had been given by former Mayor Reardon and the Union Rescue Mission to sleep in. And it was all neat. The bicycle of one of the people was chained to his EDAR so it wouldn't be taken. It was destroyed. What was the physical location of it? There were different physical locations. The EDARs were on, I believe, the San Julian or Winston Street, but on the sidewalk. Is it disputed that any of them were not on the sidewalk? No, not disputed at all. So that's undisputed. That's absolutely undisputed. Outside the hippie kitchen, people line up their carts behind this huge utility box that blocks people coming down the sidewalk on that curbside. And there was no interest that the city advanced for taking that. They submitted the declaration of Lieutenant Paulson saying people need to be able to get on and off for the bus stop. Well, that particular street is an east-west one-way street, so the bus stop is on the other side of the street. There was no interference. It had nothing to do with people in wheelchairs because a person with a wheelchair could not get past this particular utility box. It was just about a four-foot-high, four-and-a-half-feet-high utility box. Everything was neatly packed up. But critically, too, at the hippie kitchen, the public works people, who were the people who took the property, were informed that the property was not abandoned at every location. They were informed that the property was not abandoned. And that is the key issue about whether that property can be taken. What is the intent of the owner? And the law on that is clear. This circuit in the United States v. Northern made clear that it is a test based on what the owner does. And case after case has said when you have homeless people who pack their property up neatly, who go in and have to engage in the things that we all engage in every day in our houses and in our offices, but they don't have that. They go to get a drink of water. They go to the bathroom. They can't take their property in with them. Well, what about, like, at the airport, if I leave my baggage unattended because it's just too much of a hassle for me to pull it into the restroom and all of that? Can they take my baggage? Well, I think the airport is a unique situation, Your Honor, where there may be security issues that are not an issue on Skid Row in terms of unattended baggage. But if they found perhaps a black backpack or something, you know, and the district court actually dealt with this. The injunction responded to this and said if they had a legitimate concern about security, they didn't have to preserve the property in the same way, or they could take the property if it was a security concern. So the concern Your Honor is raising is built into the injunction because that was discussed there. There is a rule of law here. There is State law that says that abandoned or lost property, found property must be maintained. That applies to every public entity if they come into contact with that lost property. More importantly, that State law says every local government either has to follow the procedures set out in State law for trying to identify the owner of that property, or they can enact their own regulations. The City of Los Angeles enacted regulations in Los Angeles Municipal Code 52.55. They don't want to adhere to those at this point. And the interesting thing about that, too, is the declaration of Inspector Duncanson, who was hired apparently, according to his declaration, he was hired to apply a prior injunction. This is the third injunction against the city in about 12 years for the same activity. The first was in 1989 when they took property and told people to move along on Skid Row, the Bennion case, which is attached, was attached as an exhibit here. The second was the Justin case in 2000 where they once again, a decade later, came in, took property and told the homeless to move along and destroyed the property immediately. So after that case, apparently Inspector Duncanson was hired to make sure that they didn't violate the injunctions. Inspector Duncanson filed a declaration about how he doesn't take property that has medicine in it, identification in it, important legal papers. He looks through to see if he can find who the owner is. He waits two days. His entire declaration was contradicted, not only by the photographic evidence and the declarations of the plaintiffs, but by the evidence that the city put in, the declarations of the senior lead officer on Skid Row, who agreed with the plaintiffs that the EDARs in particular had not been in that location where they were taken and destroyed for even a day. I guess what I don't understand is if the city was the one who distributed the EDARs in the first place. Well, Mayor Ridden was no longer the mayor. This was the Union Rescue Mission. It was done with this big press conference. And, yes, the plaintiffs reasonably believe that there was some sanction to this. And, of course, as Your Honor knows, under the Jones settlement, people are allowed to be on the sidewalk at night, their property. They just have to pack it up during the day. And that's what they do. We're not talking here about piles of clothing that were dumped on the street. We're not talking about any of that. We're talking about property packed up with people present in some instances. Outside the Hippie Kitchen, it was a food service day, so there was a long line. And Mr. Lewis, who works at the Hippie Kitchen and took the photographs, told the officers that property belongs to somebody. They knew it. They didn't care. They put in declarations saying that if somebody comes along. Now, isn't there a locker somewhere where people can go check their property when they want to go eat or they want to go to the bathroom or they want to go take a shower? And how does that factor in here? Well, it's actually not quite that easy. There is a facility at Central and 7 that Chief Beck, when he was the captain on Skid Row, after the Justin settlement, he came in about two years after the Justin settlement, and he came up with this idea of having this facility at Central and 7. It isn't that easy to go in and out of that. And as the Jones opinion vacated as it is but still lays out, life on Skid Row, if you don't have a place to live, is very difficult. You are standing in line almost the entire day to get services, to get food, to get a ticket for a bed at night, to get a ticket for a shower, all of those things. So you can't be going back and forth to Central and 7 to get your property all the time. And you may need some of that property to prove that you are entitled to benefits or to do all of those things. So it just simply isn't that easy to do, Your Honor. It seems to me at the heart of all of this is that we have a huge homeless problem in our society, and we're not addressing it, but the issue is, is this the mechanism for me? Well, I... You know, I mean, I have a lot of sympathy for the issue in our society, and I think that it is one that is, it's not just sort of bigger cities maybe have more of a problem, but it's all over. And the flip side is that cities are supposed to keep, you know, they try and keep their streets clean and clear, and so the courts are, you know, but, I mean, essentially the people that we're talking about still don't really have any place to be. Your Honor is absolutely correct. And, in fact, while bigger cities have problems, Los Angeles has earned the title of the homeless capital of the United States. Every other city in the past decade got a lot of federal money to try and provide housing, because everyone knows that housing is the solution, whether it's transitional housing, temporary housing. Los Angeles does not, for the simple reason that the city is incapable of getting an application filed and would not make the personal commitment. But I think, Your Honor, that it is, not only is it unfair to then penalize homeless individuals, but it violates their due process rights and their Fourth Amendment rights. What does the Fourth Amendment protect of sex? I have concerns if, beyond this case, in terms of when you interpret the Fourth Amendment, when you interpret due process, it isn't limited to the facts of a particular case. So the way you're asking the Fourth Amendment to be interpreted, I'm trying to envision how that applies to many other circumstances as well, because that Fourth Amendment interpretation doesn't limit itself to this case. No, it doesn't limit itself. I mean, it will go in criminal cases. It will go in, you know, when we're talking about, you know, creating expectations of privacy, when we're talking about, you know, what people's property rights are, any of those things, it's expansive. Well, it is expansive, but it's not expansive, Your Honor. I think there are a number of cases that have already dealt with this. For example, the case that the appellants relied on below, United States v. Wider from the, I believe, the District of Columbia, the court had no difficulty saying, look, when you're carrying a bag that's full of, I believe it was cocaine, and you see the police watching you and you put that bag down on a public sidewalk or a public plaza and then leave because you don't want to be caught with that bag and you then get prosecuted, you don't get to exclude that evidence on the grounds of a Fourth Amendment violation. But I don't know if you said, well, I just needed to go to eat and they wouldn't let me take my, you know, my suitcase in, but my suitcase happens to have cocaine and another person's, you know, something else. I don't know why it wouldn't apply. Well, I leave that to another court, Your Honor, but I know that the United States v. Wider, it did not apply. The injunction says that if there is an objectively reasonable belief on the part of the city that her suitcase has cocaine, then they can take it because that's contraband, that's what the injunction says. They just have to have a reasonable belief. So I ask you a question. Have you had any settlement discussions in this case? No, Your Honor. The city did not want to have any settlement discussions. Well, maybe they would be willing to accept our mediation process. As I think you know, we have a rather effective mediation system at this court. You mean have them do the mediation before I write the opinion? Or are you rejecting it? You can ask this field, but the city rejected that once. We actually are. Who's making the policy? We actually are scheduled for mediation in the Jones case. The case that will never end. But, you know, it's hard for me to believe with the enlightened city administration we have that I know Mayor Reardon is gone, but there is an administration. That's why I asked the question of who's setting this policy. Well, you know, quite frankly, Your Honor, I have had discussions with, this drives the city attorney nuts, but I'm allowed to do this. I've had discussions both with Chief Beck and with the Special Assistant for Constitutional Policing, Mr. Chaler. I love his title. About the case. Because this is the third time that the city has been sued over this. And I don't think there's a court in the country that has even setting aside the Fourth Amendment issue, Judge Callahan, the due process issue alone prohibits them from destroying the property without a pre or post deprivation remedy here. They are essentially saying at this point that the property being on the sidewalk is evidence of a crime. The crime is having property on a sidewalk, on a public place, and that they will act as judge and jury, even though that's a misdemeanor. And the evidence that we submitted with Mr. Hammy's declaration showed that throughout Skid Row, including right in back of the police station, they allow people to violate that law with impunity, but not the homeless. So if you walk down Fifth Street across from the police station, you have to walk around all these boxes of merchandise and people setting up tables and selling stuff, which they're not allowed to do under the law. If you go on Winston Street where the EDARs are, that was the photograph of the huge bird cages and the people with the carts and, you know, everything else. So it isn't that the problems are so intractable or so horrendous that they remove everything. It's that they only remove the property of the homeless. And in this instance, all of the evidence is they remove property neatly packed up in carts from the hippie kitchen. Thank you, Ms. Sobel. Thank you. Counsel? Yeah, I want to correct a couple of things. Ms. Sobel referred to the State law that sets forth the procedure that, according to her, the government has to follow when it encounters, she said, abandoned or lost property. That's absolutely untrue. That statute applies solely to lost property. It has nothing to do with abandoned or unattended property, and that's the kind of property we're dealing with here. Ms. Sobel has also said that there's lots of law that affords, you know, protected rights under the Fourth and the Fourteenth Amendment in this kind of situation, but I've yet to see or cite one circuit opinion that's on point. This Court is not riding on a clean slate. I have cited the three cases that I believe are directly on point, the Amos-Quita case, the Ruckman case, and the Zimmerman case out of this circuit, which cited with approval both the decisions in Ruckman and Amos-Quita. And I just very quickly want to read just a couple of statements of law from Amos-Quita that I think apply directly to this case. At page 11 of that opinion, it says, a trespasser who places his property where it has no right to be has no right of privacy as to that property. Then again at page 12, I believe. But when it says no right of privacy, and I think the facts are distinguishable in that case as well, but that's not the same as property right. Well, let's move on to the property rights and whether this is a protected property interest under the Fourteenth Amendment. The Amos-Quita court did exactly what I've just argued to this court. A similar answer is required to the question of whether there is a protected property interest. We turn to Commonwealth law to determine whether such a protected interest exists, and it cites Board of Regents v. Roth. Then they look at the Commonwealth law, which says that you can't build, plant, or sow on somebody else's land. And based on that law, it says, these statutes preclude us from recognizing in the plaintiffs a property interest in the land which could not be disturbed without procedural preliminaries. That's exactly what we have here. We have LAMC 5611, which says you can't leave your stuff on the city sidewalk. So that's a little different from a trespasser leaving his ñ when he's burglarizing a house, for instance, leaving something on somebody else's land. I think he was building a community and growing food on government land. I also want to talk to the court about what's been happening in the city of Los Angeles post-injunction. We're not talking about neatly packed carts that are just momentarily left outside of the hippie kitchen. Under this injunction, people are now piling their belongings up against the wall on city streets. They're covering their belongings with a blue tarp, clearly evidencing that they're not intending to abandon this property, and this property sits day after day. It extends well out into the sidewalk. I stood on at 6th and Wall Street the other day for about 15 minutes, and in that short period of time, I saw a guy in a wheelchair have to go off the sidewalk, into traffic to bypass these mounds of things that are left on the sidewalk unattended. I saw an old woman with a walker and her little dog who couldn't walk by on this sidewalk. It's a problem. It's a problem that the people of Skid Row should not have to put up with, particularly when they're not protected under the Constitution. But the injunction gives you an exemption from complying with it if the property presents an immediate threat to public health or safety. I mean, why couldn't you move that under this injunction? It's arguable. I'm telling you the city workers look at this. They say this is someone's property. They've clearly marked it as their property. It's unattended, but it's not abandoned. It doesn't have contraband. We don't know what's under the blue tarp, so we don't know if there are drugs or, you know, feces and urine and crusted clothes. But you just said it presents a threat to safety. I'm sorry? You just said it presents a threat to safety. Okay, so what? That this little old woman had to walk into the street. Let's assume it does. So what's the city's next option? City workers then have to go, and we can't toss the stuff out because it's not abandoned. It has to be stored then at city expense under what authority? There's no authority that allows that. For 90 days on the hopes that maybe someone, some unknown person, we don't know who this property belongs to, will come and claim it. There's no limit on the amount of stuff you can leave on the property. We're not talking about one neat little bedroll. I mean, we have hoarders that are living there that, I'm telling you, they accumulate massive amounts of stuff. Well, this is a preliminary injunction, right? And now you're telling us about things that have happened since the preliminary injunction. I think we're applying a certain set of standards to the preliminary injunction. It seems to me, as the case proceeds, that some of this evidence would be evidence that you would come and present as to the merits of this case. Your Honor, I guess my response to that is, before that's done, I think the fundamental question has to be answered, whether there's a constitutionally protected right to do this under the Fourth or the Fourteenth Amendment. And I think to find such a right is a departure from Amiskita, Ruckman, and Zimmerman. And it just, you know, it's in conflict with these decisions. I mean, I could pull more quotes out of this, but that's what those three cases stand for. If you're illegally operating somebody's property, you don't have a protected right under the Fourth Amendment or the Fourteenth Amendment. Plain and simple. That's the state of the law. Thank you, Your Honor. Thank you. Thank you both. The case, as argued, will be submitted. The next case and final case to be argued is NCCO versus. No, that's submitted. Oh, that's submitted? Oh, good. It's Nevada versus Bank of America.
judges: Reinhardt, Wardlaw, Callahan